# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

FELIX SAIZ,

      Plaintiff,

      vs.                         No. 1:21-CV-00310-KRS

KILOLO KIJAKAZI, Acting Commissioner
of the Social Security Administration,

      Defendant.

## MEMORANDUM OPINION AND ORDER

THIS MATTER is before the Court upon Plaintiff's Motion to Reverse and Remand for a Rehearing with Supporting Memorandum (Doc. 20), dated November 15, 2021, challenging the determination of the Commissioner of the Social Security Administration ("SSA") that Plaintiff is not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-34. The Commissioner responded to Plaintiff's motion on February 17, 2022 (Doc. 24), and Plaintiff filed a reply brief on March 17, 2022 (Doc. 27). With the consent of the parties to conduct dispositive proceedings in this matter, *see* 28 U.S.C. § 636(c); FED. R. CIV. P. 73(b), the Court has considered the parties' filings and has thoroughly reviewed the administrative record. Having done so, the Court concludes that the ALJ erred in his decision and will therefore GRANT Plaintiff's motion and remand this case back to the SSA for proceedings consistent with this opinion.

## I. PROCEDURAL POSTURE

On July 10, 2018, Plaintiff filed an initial application for disability insurance benefits. (*See* Administrative Record ("AR") at 45). Plaintiff alleged that he had become disabled on May 23, 2018, due to age-related macular degeneration of the right eye. (*Id.* at 47-48). His application

was denied at the initial level on January 24, 2019 (*id.* at 45), and at the reconsideration level on July 2, 2019 (*id.* at 56). Plaintiff requested a hearing (*id.* at 84-85), which ALJ Jim Fraiser conducted telephonically on August 13, 2020 (see *id.* at 32-44). Plaintiff was represented by counsel and testified at the hearing (*id.* at 34-42), as did vocational expert Thomas Greiner (the "VE") (*id.* at 42-43).

On August 28, 2020, the ALJ issued his decision, finding that Plaintiff was not disabled under the relevant sections of the Social Security Act. (*Id.* at 15-26). Plaintiff requested that the Appeals Council review the ALJ's decision (*id.* at 189-91), and on February 11, 2021, the Appeals Council denied the request for review (*id.* at 1-3), which made the ALJ's decision the final decision of the Commissioner. On April 7, 2021, Plaintiff filed the complaint in this case seeking review of the Commissioner's decision. (Doc. 1).

## II. Legal Standards

### A. Standard of Review

Judicial review of the Commissioner's decision is limited to determining "whether substantial evidence supports the factual findings and whether the ALJ applied the correct legal standards." *Allman v. Colvin*, 813 F.3d 1326, 1330 (10th Cir. 2016); *see also* 42 U.S.C. § 405(g). If substantial evidence supports the ALJ's findings and the correct legal standards were applied, the Commissioner's decision stands, and the plaintiff is not entitled to relief. *See, e.g.*, *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). Although a court must meticulously review the entire record, it may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *See, e.g.*, *id.* (quotation omitted).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation

omitted); *Langley*, 373 F.3d at 1118 (quotation omitted). Although this threshold is "not high," evidence is not substantial if it is "a mere scintilla," *Biestek*, 139 S. Ct. at 1154 (quotation omitted); "if it is overwhelmed by other evidence in the record," *Langley*, 373 F.3d at 1118; or if it "constitutes mere conclusion," *Grogan v. Barnhart*, 399 F.3d 1257, 1261-62 (10th Cir. 2005) (quotation omitted). Thus, the Court must examine the record as a whole, "including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan*, 399 F.3d at 1262. While an ALJ need not discuss every piece of evidence, "[t]he record must demonstrate that the ALJ considered all of the evidence," and "a minimal level of articulation of the ALJ's assessment of the evidence is required in cases in which considerable evidence is presented to counter the agency's position." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). "Failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984) (quotation omitted).

## B. Disability Framework

"Disability," as defined by the Social Security Act, is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The SSA has devised a five-step sequential evaluation process to determine disability. *See Barnhart v. Thomas*, 540 U.S. 20, 24 (2003); *Wall v. Astrue*, 561 F.3d 1048, 1051-52 (10th Cir. 2009); 20 C.F.R. §§ 404.1520, 416.920. If a finding of disability or non-disability is directed at any point, the SSA will not proceed through the remaining steps. *Thomas*, 540 U.S. at 24. At the first three steps, the ALJ considers the claimant's current work activity and the severity of his impairment

or combination of impairments. *See id.* at 24-25. If no finding is directed after the third step, the Commissioner must determine the claimant's residual functional capacity ("RFC"), or the most that he is able to do despite his limitations. *See* 20 C.F.R. §§ 404.1520(e), 404.1545(a)(1), 416.920(e), 416.945(a)(1). At step four, the claimant must prove that, based on his RFC, he is unable to perform the work he has done in the past. *See Thomas*, 540 U.S. at 25. At the final step, the burden shifts to the Commissioner to determine whether, considering the claimant's vocational factors, he is capable of performing other jobs existing in significant numbers in the national economy. *See id.*; *see also Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (discussing the five-step sequential evaluation process in detail).

### III.  THE ALJ'S DETERMINATION

The ALJ reviewed Plaintiff's claim pursuant to the five-step sequential evaluation process. (AR at 16-17). First, the ALJ found that Saiz meets the insured status requirement through December 31, 2023, and had not engaged in substantial gainful activity since prior to his alleged onset date. (*See id.* at 17). The ALJ then found at step two that Saiz suffered from the following severe impairments: vision loss, chronic obstructive pulmonary disease, coronary artery disease, and osteoarthritis. (*See id.*). At this stage, the ALJ concluded that Saiz possessed only mild limitations in the four broad areas of mental functioning, meaning that he did not satisfy the "paragraph B" criteria of the relevant listings under Appendix 1 § 12.00 of the SSA's regulations. (*See id.* at 17-19). From this, the ALJ concluded that Saiz's depressive, bipolar, and related disorders, as well as his anxiety and obsessive-compulsive disorders, were medically determinable but non-severe. (*See id.* at 18).

At step three, the ALJ concluded that Saiz did not have an impairment or combination of impairments that met the criteria of listed impairments under Appendix 1. (*See id.* at 19). In so

holding, the ALJ determined that Saiz's physical impairments did not meet sections 2.02 (loss of visual acuity) and 2.04 (loss of visual efficiency) of Appendix 1. (*See id.*).

Proceeding to the next step, the ALJ reviewed the evidence of record, including statements and other medical evidence from treating, consulting, and nonexamining medical sources, as well as Saiz's own subjective symptom evidence. (*See id.* at 20-24). Based on his review of the evidence, the ALJ concluded that Saiz possessed an RFC to perform medium work but that he should avoid commercial driving, working at heights or with dangerous/hazardous machinery, working with open ground hazards, working with sharp objects or ladders, and concentrated exposure to chemicals, dust, or fumes. (*See id.* at 19). The ALJ then determined that Saiz had no past relevant work, ending the step-four inquiry. (*See id.* at 24).

Moving to step five, the ALJ determined that Saiz was able to perform jobs existing in significant numbers in the national economy, specifically identifying the positions of Industrial Cleaner, Kitchen Helper, and Floor Waxer. (*See id.* at 25). The ALJ therefore concluded that Saiz was not precluded from work by his RFC and that he was not disabled. (*See id.* at 25-26).

## IV. DISCUSSION

Saiz contends that the ALJ failed to address certain relevant evidence at step four (*see* Doc. 20 at 9-11) and failed at step five to make factual findings necessary to resolve conflicts between the VE's testimony and reliable job information available in governmental publications (*see id.* at 12-15).[1] Although the ALJ did not err in his handling of evidence at step four, the Court concludes that an apparent conflict exists between the VE's testimony and certain information in the Dictionary of Occupational Titles, that the ALJ failed to resolve this apparent conflict at step five, and that this error was not harmless.

---

[1] Saiz has abandoned an earlier argument (*see* Doc. 20 at 15-16) concerning the constitutionality of the Commissioner's exercise of authority over his application. (*See* Doc. 27 at 2).

### A.   Evaluation of Evidence Concerning Mental Impairments at Step Four

After determining at step two that Saiz's medically determinable mental impairments were nonsevere (AR at 18-19), the ALJ echoed that determination at step four, concluding that there was "no objective evidence of marked limitations in any area of functioning[] which would preclude the claimant's ability to perform work" (*id.* at 22). The ALJ acknowledged "some limitations" in mental functioning at this later stage of analysis, but he stated that the record "appear[ed] to show normal limits" in such functioning, and he observed that Saiz had "received minimal mental health counseling and/or treatment" and had never undergone inpatient psychiatric hospitalization. (*See id.*). Saiz argues that the ALJ erred at this step by failing to discuss relevant evidence concerning his mental impairments before reaching his step-four conclusions. (*See* Doc. 20 at 9-11). The Commissioner responds that the ALJ adequately addressed the evidentiary record and that any error in his discussion of that record was harmless. (*See* Doc. 24 at 15-18).[2]

In evaluating a claimant's RFC, an ALJ must discuss not only "the evidence supporting his decision," but also "the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). Along these lines, "[i]t is improper for the ALJ to pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence."

---

[2] The Commissioner also suggests that Saiz has implicitly conceded his step-four argument by failing to challenge the ALJ's step-two determination that his mental conditions did not amount to severe impairments. (*See* Doc. 24 at 15). This suggestion reads too much into Saiz's framing of his step-four argument, given that a step-two challenge is foreclosed when the ALJ finds that at least one of a claimant's impairments is severe. *See, e.g.*, *Carpenter v. Astrue*, 537 F.3d 1264, 1265-66 (10th Cir. 2008) (holding that errors at step-two are rendered harmless where ALJ concludes that benefits cannot be denied at this step); *Oldham v. Astrue*, 509 F.3d 1254, 1256 (10th Cir. 2007) ("The ALJ . . . made an explicit finding [at step two] that [claimant] suffered from severe impairments. That was all the ALJ was required to do in that regard."). At any rate, "a conclusion that the claimant's mental impairments are non-severe at step two does not permit the ALJ simply to disregard those impairments when assessing a claimant's RFC and making conclusions at steps four and five." *Wells v. Colvin*, 727 F.3d 1061, 1068-69 (10th Cir. 2013).

*Carpenter v. Astrue*, 537 F.3d 1264, 1265 (10th Cir. 2008) (quotation omitted). Likewise, an ALJ is not permitted to "mischaracterize or downplay evidence to support her findings." *Bryant v. Comm'r, SSA*, 753 F. App'x 637, 641 (10th Cir. 2018) (unpublished) (citing *Talbot v. Heckler*, 814 F.2d 1456, 1463-64 (10th Cir. 1987)).[3] Failure to follow these controlling legal standards is grounds for remand. *See, e.g., Byron v. Heckler*, 742 F.2d 1232, 1235 (10th Cir. 1984).

The ALJ noted an August 3, 2018 treatment record where, as part of a patient health questionnaire, Saiz reported having little interest or pleasure in doing things and feeling down, depressed, and/or hopeless. (*See* AR at 21) (citing "Exhibit 13F2," AR at 457). The ALJ also noted, though, that Saiz possessed intact insight and judgment, exhibited normal mood and affect, and reported no hallucinatory, suicidal, homicidal, depressive, or anxious symptoms at this appointment. (*See id.*); (*see also id.* at 457-58). Saiz argues the ALJ erred by failing to note Saiz's identical mental condition—the exact same questionnaire responses, insight and judgment, mood and affect, and absence of psychiatric symptoms—at two follow-up appointments over the next six months. (*See* Doc. 20 at 10-11) (citing AR at 460); (Doc. 27 at 3) (citing AR at 460-61, 463-64). Because these objective signs and findings are facially cumulative of the evidence discussed by the ALJ, Saiz has not shown that the ALJ ignored or rejected them, much less that they are significantly probative. *Cf. Clifton*, 79 F.3d at 1010. The Court finds no error.

Aside from these matters, Saiz focuses on records from his psychotherapy appointments with Erika M. Guzman, Ph.D., at the Department of Veterans Affairs. (*See* Doc. 20 at 11). Saiz particularly highlights notes from his August 15, 2019 initial encounter with Dr. Guzman, where the record reflects his subjective symptom statements concerning being "happy one moment then crying," his discomfort around or detachment from people, his fatigue and concentration issues,

---

[3] The Court cites *Bryant*, other unpublished decisions of the Tenth Circuit, decisions from other circuits, and the district court decisions referenced in this opinion for their persuasive value unless otherwise stated.

low self-esteem, irritability and racing thoughts, nightmares and trauma-avoidant behavior, observations of dysthymic mood, and an assessment of adjustment disorder with mixed symptoms. (*See id.*) (citing AR at 543-46). However, at his next visit with Dr. Guzman in January 2020, Saiz reported that he was feeling better and coping better than during his previous visit, his mood was observed to be euthymic, and he was able to better articulate the negative feelings he had been experiencing. (*See* AR at 526-27). Although Dr. Guzman revised her diagnosis to major depressive disorder, she assessed his risk of harm to self and others as "LOW (few risks, many protections)," and she set a follow-up appointment for one month later. (*See id.*). While Saiz discussed some sleep difficulties and grief at his February 2020 appointment, Dr. Guzman continued to characterize his condition as improved (*see id.* at 524-25), and by March 2020 he was "feeling 'better,'" was experiencing reduced anxiety, and was no longer randomly crying (*see id.* at 719-20). The only other appointment on record with Dr. Guzman was a fifteen-minute phone encounter in April 2020, where Saiz "reported he was doing well and wanted to just engage a brief check[-]in." (*See id.* at 718). Saiz again told Dr. Guzman that his depression had improved, and he was moved from a regular appointment schedule to outpatient treatment on an "as needed" basis. (*See id.*).

Although the ALJ did not explicitly cite to these treatment notes, the Court finds that his characterization of this record as reflecting "minimal mental health counseling and/or treatment" was accurate and adequate. The records from Dr. Guzman, viewed in their full context, reflect someone experiencing difficult and depressive feelings at the time of his initial encounter (*see id.* at 543-46) but improving significantly as of subsequent visits (*see id.* at 524-27, 718-20), to the point that this provider appeared not to see a need for regular psychotherapy sessions after just five encounters (*see id.* at 718). While the ALJ accurately observed that this record reflected

"some limitations" in mental functioning, he also correctly determined that the record failed to show any "objective evidence of marked limitations in any area of functioning" when viewed longitudinally and in context. (*See id.* at 22). In short, the record adequately reflects that the ALJ considered all of the evidence, and Saiz has not shown that the ALJ "mischaracterize[d] or downplay[ed] evidence," *cf. Bryant*, 753 F. App'x at 641 (citation omitted), or that he rejected any "significantly probative" evidence, *see Clifton*, 79 F.3d at 1010.

The Tenth Circuit's decision in *Wells*, which Saiz cites as his primary authority when challenging the ALJ's step-four findings (*see* Doc. 20 at 9, 10), is inapposite. In that decision, the ALJ conducted a step-two severity analysis immediately before determining in cursory fashion that his step-two findings "do not result in further limitations in work-related functions in the RFC assessment below." *See Wells v. Colvin*, 727 F.3d 1061, 1069 (10th Cir. 2013) (cleaned up). The Tenth Circuit concluded that this step-two discussion, on its own, was "inadequate" as a substitute for addressing a claimant's mental impairments at step four. *See id.* But the court further held that a separate discussion of mental impairments elsewhere in the ALJ's decision, though brief, "might have satisfied the ALJ's obligation at step four" if that discussion had not been beset with legal errors. *See id.* at 1069-71 (noting ALJ's reliance on outdated medical records outside of the administrative record, mischaracterizations of function report contents, misstatements about claimant's employment record, and overemphasis on skills required in claimant's short-term and part-time work). By contrast, while the step-four discussion of Saiz's mental impairments—like the one at issue in *Wells*—was "far from comprehensive," *see* 727 F.3d at 1069, Saiz has identified no legal errors underlying the ALJ's step-four findings that he received only "minimal" mental health treatment, that he has not required inpatient psychiatric hospitalization, and that "his mental health exams overall appear to show normal limits" (*see* AR

at 22). Nor has Saiz argued that the step-four discussion of his mental impairments was inadequate even if, unlike *Wells*, the ALJ did not commit legal errors in his discussion of the relevant evidence.[4] Accordingly, *Wells* does not control this case.

Saiz's argument that the ALJ did not consider all of the relevant evidence pertaining to his mental impairments is not well-taken, and Saiz has identified no other alleged errors at step four. Without more, the Court does not find that the ALJ committed legal error at step four and will not direct remand on this ground.

### B.  Evaluation of Apparent Conflicts at Step Five

The ALJ found at step five that there are jobs available in significant numbers in the national economy that Saiz can perform despite his RFC restrictions. (*See* AR at 25). This finding was premised on the VE's testimony that a hypothetical person with Saiz's RFC can perform the work of an Industrial Cleaner, for which there are 16,000 jobs available nationally; that of a Kitchen Helper, for which 145,000 nationally available jobs exist; and that of a Floor Waxer, with 118,000 jobs available in the national economy. (*See id.*); (*see also id.* at 42-43). The VE testified that his findings were consistent with the information contained in U.S. Dep't of Labor, *Dictionary of Occupational Titles* (4th ed. rev. 1991) (hereinafter the "DOT")[5] (*see* AR at 43), and the ALJ found this to be the case in his decision (*see id.* at 25). Saiz now argues that the ALJ failed to resolve apparent conflicts between the DOT and the VE's testimony.

At step five, the Commissioner is "responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that [the claimant] can do,

---

[4] It could be argued that there is some incongruity between the ALJ's implicit acknowledgement that Saiz possesses "some limitations" in mental functioning (*see* AR at 22) and the absence of any explicit nonexertional restrictions included in his RFC for "medium work" (*see id.* at 19). But if such an incongruity exists, Saiz has not identified it, and the Court cannot make that argument for him. After all, the ALJ's conclusion that Saiz's mental functioning was overall within "normal limits" (*id.* at 22) could just as easily be read as a signal that no additional nonexertional RFC restrictions were required.

[5] DOT listings are available as of this writing at https://occupationalinfo.org (last visited March 31, 2022).

given [his] residual functional capacity and vocational factors." 20 C.F.R. § 404.1560(c)(2). In

meeting this burden, the Commissioner may rely on information in the DOT and its companion

publication, U.S. Dep't of Labor, *Selected Characteristics of Occupations Defined in the Revised*

*Dictionary of Occupational Titles* (1993) (the "SCO"),[6] as well as VE testimony. *See* 20 C.F.R.

§ 404.1566(d)-(e) (providing for ALJ reliance on, *inter alia*, DOT and VE testimony); *see also*

*Kimes v. Comm'r, SSA*, 817 F. App'x 654, 658 (10th Cir. 2020)) (unpublished) (recognizing

SCO as companion publication to DOT that may be considered at step five).

     The ALJ "has an affirmative responsibility to ask about any possible conflict between

[any] VE . . . evidence and information provided in the DOT." Social Security Ruling

("SSR") 00-4p, 2000 WL 1898704, at *4 (Dec. 4, 2000).[7] "[I]f there is an apparent conflict

between expert testimony and the DOT, the ALJ must 'obtain a reasonable explanation for the

apparent conflict.'" *Valdez v. Kijakazi*, 20-cv-01263 RB/GJF, 2022 WL 683024, at *3 (D.N.M.

Mar. 8, 2022) (citing SSR 00-4p, 2000 WL 1898704, at *4); *see also Haddock v. Apfel*, 196 F.3d

1084, 1091 (10th Cir. 1999) ("[A]n ALJ must investigate and elicit a reasonable explanation for

any conflict between the Dictionary and expert testimony before the ALJ may rely on the

expert's testimony as substantial evidence to support a determination of nondisability.").

     "Importantly, . . . an ALJ must only seek such a reasonable explanation if there

first *appears* to be a conflict between the vocational expert's testimony and the DOT." *Valdez*,

2022 WL 683024, at *4 (citing *Haddock*, 196 F.3d at 1091). In unpublished but persuasive

caselaw, the Tenth Circuit has adopted another court's characterization of the ALJ's burden:

---

[6] The Commissioner cites to the copy of the SCO available at http://onlineresources.wnylc.net/docs/
SelectedCharacteristicsSearch121110.pdf (last visited March 31, 2022).

[7] SSRs are binding on the SSA, and while they do not have the force of law, courts traditionally defer to SSRs since
they constitute the agency's interpretation of its own regulations and foundational statutes. *See Sullivan v. Zebley*,
493 U.S. 521, 531 n.9 (1990); 20 C.F.R. § 402.35; *see also Andrade v. Sec'y of Health & Human Servs.*, 985 F.2d
1045, 1051 (10th Cir. 1993) (SSRs entitled to deference).

> [T]o the extent that there is any implied or indirect conflict between the vocational expert's testimony and the DOT . . . the ALJ may rely upon the vocational expert's testimony provided that the record reflects an adequate basis for doing so. . . . [A]ll kinds of implicit conflicts are possible and the categorical requirements listed in the DOT do not and cannot satisfactorily answer every such situation. Moreover, claimants should not be permitted to scan the record for implied or unexplained conflicts between the specific testimony of an expert witness and the voluminous provisions of the DOT, and then present that conflict as reversible error, when the conflict was not deemed sufficient to merit adversarial development in the administrative hearing. Adopting a middle ground approach, in which neither the DOT nor the vocational expert testimony is per se controlling, permits a more straightforward approach to the pertinent issue, which is whether there is substantial evidence supporting the Commissioner's determination that this particular person can do this particular job or group of jobs.

*Gibbons v. Barnhart*, 85 F. App'x 88, 93 (10th Cir. 2003) (unpublished) (quoting *Carey v. Apfel*, 230 F.3d 131, 146-47 (5th Cir. 2000)); *see also, e.g.*, *Kyle Edward Victor G. v. Saul*, No. 19-cv-2518-JWL, 2020 WL 3960422, at *9 (D. Kan. July 13, 2020) ("SSR 00-4p requires the ALJ to address apparent conflicts, not all conflicts.").

Neither party disputes that the ALJ met his initial step-five burden to affirmatively ask whether there were any conflicts between the VE's evidence and the DOT as required by SSR 00-4p. (*See* AR at 43). Instead, Saiz argues that there were "implied or unexplained conflicts" between the VE's testimony and "the voluminous provisions of the DOT," even though such conflicts were not the subject of any "adversarial development in the administrative hearing." *Cf. Gibbons*, 85 F. App'x at 93 (quotation omitted); (*cf. also* AR at 43) (showing that attorney questioning of VE at hearing focused only on possibility that Saiz might become a "safety hazard" due to falling risks). Although the Court finds that this argument is not well-taken as to the Floor Waxer position, apparent conflicts do exist between the VE's testimony and the DOT provisions for the position of Kitchen Helper, and the ALJ did not raise or resolve these conflicts. Because the record does not indicate that the number of jobs available to Saiz in the national economy is significant if the Kitchen Helper jobs are eliminated, and because the Court

is unable to determine as much as a matter of law, the ALJ's error was not harmless. Remand is required on this basis, and the Court therefore does not reach the question of whether there is any apparent and unresolved conflict between the VE's testimony and the DOT provisions pertaining to the Industrial Cleaner position.

          *i.   Floor Waxer*

With respect to the job of Floor Waxer, Saiz argues that his RFC restrictions to avoid work with "dangerous/hazardous machinery[] or open ground hazards" would prevent him from performing certain duties required of that job according to the DOT, specifically the following tasks: "Cleans, waxes, and polishes floors by hand or machine"; "Applies paste or liquid wax to floor with rags or machine"; and "Polishes floor with electric polishing machine or weighted brush." (Doc. 20 at 14) (citing DOT # 381.687-034). The Court finds no "apparent" conflict here, however. Even if the Court were to ignore the DOT proviso that each of these tasks may be performed "by hand" or "with rags," Saiz does not elaborate as to whether or why any of the "machine[s]" referenced in the Floor Waxer tasks should be considered "dangerous" or "hazardous." Indeed, the SCO states that this position requires *no* proximity to moving mechanical parts, *see, e.g.* "Floor Waxer," DOT # 381.687-034, 1991 WL 673262, meaning that there is no "[e]xposure to possible bodily injury from moving mechanical parts of equipment, tools, or machinery," SCO at D-2.[8] Likewise, Saiz does not elaborate on how any of the aforementioned tasks may risk exposure to "open ground hazards," as no such hazards are apparent on the face of the listing.

Saiz also complains that his RFC conflicts in other ways with the Floor Waxer tasks "Removes dirt and blemishes from floor, using various cleaning solvents and compounds";

---

[8] *See also* SCO at 132 (codes for environmental conditions of Floor Waxer position); *id.* at ID-2 (explaining coding).

"Applies paste or liquid wax to floor with rags or machine"; and "Polishes floor with electric polishing machine or weighted brush." (Doc. 20 at 14) (citing DOT # 381.687-034). Having apparently misread the RFC restriction requiring that he avoid "*concentrated exposure* to chemicals, dust or fumes" (*see* AR at 19) (emphasis added), Saiz contends that such tasks would not allow him to "[a]void chemicals, dust and fumes" altogether (*see* Doc. 20 at 14). Again, the Court sees no apparent conflict between the RFC restriction—as it is actually phrased—and the aforementioned tasks, which do not on their face require "concentrated" exposure to chemicals, dust, or fumes. This conclusion, too, is supported by the SCO, which provides that the Floor Waxer position requires *no* exposure to toxic or caustic chemicals. *See, e.g.* "Floor Waxer," DOT, 1991 WL 673262.[9]

In his reply brief, Saiz notes that the Floor Waxer position requires "frequent" exposure to "other environmental conditions." *See id.* "However, 'other environmental conditions' is a catch-all term for conditions not [otherwise] described" in the SCO. *Hitchcock v. Berryhill*, No. 4:16-cv-00378-JED-GBC, 2017 WL 9771799, at *11 (N.D. Okla. Aug. 3, 2017), *R&R adopted in relevant part*, 2018 WL 1558280 (N.D. Okla. Mar. 30, 2018). The SCO states that such conditions

> may include, but are not limited to, such settings as demolishing parts of buildings to reach and combat fires and rescue persons endangered by fire and smoke; mining ore or coal underground; patrolling assigned beat to prevent crime or disturbance of peace and being subjected to bodily injury or death from law violators; diving in ocean and being subjected to bends and other conditions associated with high water pressure and oxygen deprivation; patrolling ski slopes prior to allowing public use and being exposed to danger of avalanches.

SCO at D-2. There is no indication that any of the hazards mentioned in that list would be present in the position of Floor Waxer, and Saiz has not himself identified any specific "other

---

[9] *See also* SCO at 132.

environmental conditions" inherent to that job that would conflict with his RFC restrictions.
Without more, the ambiguous notation that "other environmental conditions" may be present in a
Floor Waxer position does not result in an "apparent" conflict between that job and Saiz's RFC.
*See, e.g.*, *Hitchcock*, 2017 WL 9771799, at *11 (finding no evidence of conflict where conditions
listed under "other environmental conditions" were not present in proposed work and claimant
had not identified other potential conditions in conflict with RFC restrictions); *Whitewolf v.
Colvin*, No. CIV-14-610-M, 2015 WL 2345500, at *7-8 (W.D. Okla. May 14, 2015) (same).

 In short, "the record reflects an adequate basis" for the ALJ to have relied upon the VE's
hearing testimony concerning the Floor Waxer position, including his statement that his evidence
was consistent with the DOT. *See Gibbons*, 85 F. App'x at 93. Saiz did not identify any conflicts
between the Floor Waxer position and the proposed RFC during that hearing (*cf.* AR at 42-43),
and while he lists certain DOT job requirements that are purportedly in conflict with RFC
restrictions, he does not explain how or why those matters should be seen as conflicting, much
less show that any such conflict would have been "obvious enough that the ALJ should have
picked up on them without any assistance." *See Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir.
2008) (reiterating claimant's persuasive burden at step five since "SSR 00-4p requires only that
the ALJ investigate and resolve *apparent* conflicts between the VE's evidence and the DOT");
*see also Valdez*, 2022 WL 683024, at *5 (citing, *e.g.*, *Shinseki v. Sanders*, 556 U.S. 396, 409
(2009)) (agreeing that step-five challenge on judicial review failed because "it was Plaintiff's
burden to establish that there was an apparent conflict between the vocational expert's testimony
and the DOT, and because she has failed to establish such a conflict").[10] If anything, the relevant

---

[10] Although Plaintiff correctly stresses that the Commissioner bears the burden of *proof* at step five (*see* Doc. 20 at 12) (citation omitted), the burden to *persuade* the factfinder that he is disabled remains with the claimant. *See* Clarification of Rules, 68 Fed. Reg. 51153, 51155 (Aug. 26, 2003) (noting that step five requires a "limited shift in the burden of proof" and in "production of evidence," requiring ALJ to "provide evidence that demonstrates that

SCO provisions support a finding that no such conflicts exist, and Saiz has not persuaded the Court that a contrary conclusion is warranted. Accordingly, the Court concludes that substantial evidence supported the ALJ's step-five determination that Saiz can perform Floor Waxer duties despite his impairments.

### ii.   Kitchen Helper

Although Saiz also argues that there are apparent conflicts between the VE's testimony and the DOT listings for the Kitchen Helper position (*see* Doc. 20 at 14), this argument is often characterized by the same problems plaguing his arguments as to the Floor Waxer position. For instance, although Saiz contends that several of the tasks in the Kitchen Helper position require contact with "dangerous/hazardous machinery" (*see id.*), he does not explain why any of the machines cited therein should be considered dangerous or hazardous, and the Court cannot find those machines to be dangerous or hazardous as a matter of law. Further, Saiz's argument directly conflicts with SCO provisions stating that this position does not require proximity to moving mechanical parts. *See* "Kitchen Helper," DOT # 318.687-010, 1991 WL 672755.

On the other hand, Saiz does point to one facially legitimate "apparent conflict" with respect to the Kitchen Helper position. Although Saiz's RFC requires that he "avoid working with sharp objects" (AR at 19), the DOT provides that the job duties for Kitchen Helper require

---

jobs exist in significant numbers in the national economy that you can do, given your RFC, age, education, and work experience," but that "the ultimate burden of persuasion . . . remains with [the claimant]"); *see also, e.g.*, *Kuykendall v. Berryhill*, No. 16-cv-010197 GJF, 2018 WL 1441199, at *4-6 (D.N.M. Mar. 22, 2018) (citing, *e.g.*, *Rivera v. Berryhill*, 242 F. Supp. 3d 1226, 1231 (D.N.M. 2017)). In the context of judicial review of an ALJ's step-five determinations, this means that while the Commissioner must *prove* that a claimant can still perform jobs existing in significant numbers despite his impairments, the claimant bears the *persuasive* burden of raising a *prima facie* argument that the Commissioner has failed to meet his evidentiary burden. *See, e.g.*, *Valdez*, 2022 WL 683024, at *5 (citing, *e.g.*, *Shinseki*, 556 U.S. at 409). Thus, as an extreme example, a claimant could not satisfy his persuasive burden by filing a remand motion simply stating "the ALJ failed to prove my disability at step five" and then demanding without further elaboration that the Commissioner prove him wrong. For this reason, the Court views with disfavor Saiz's chart-based approach to asserting errors at step five, in which he juxtaposes DOT job requirements in one column and RFC restrictions in the other without presenting developed argumentation as to why the former is in conflict with the latter. (*See* Doc. 20 at 13-14).

the use of a "knife or peeling machine" to wash and peel vegetables, *see* 1991 WL 672755. The DOT also provides that a Kitchen Helper is responsible for washing and polishing certain dishes, which Saiz reasonably assumes would include "sharp objects like knives." (*See* Doc. 20 at 14 & n.14). Unlike the asserted conflicts that Saiz raises as to the Floor Waxer position, the conflict between these job duties and his RFC restrictions is apparent on its face—and, importantly, the ALJ neither addressed nor resolved this apparent conflict. Moreover, the ALJ obtained no testimony from the VE as to whether there may exist Kitchen Helper jobs that would not require Saiz to perform these tasks, and if so, whether this would modify the projected number of such Kitchen Helper jobs available to Saiz in the national economy. Without additional clarification, inquiry, or resolution of this conflict, the ALJ's determination that Saiz could perform the job of Kitchen Helper is not supported by substantial evidence.

### iii.   Harmless Error

The above determination leaves the Court in uncertain territory. Although the ALJ found that Saiz would be able to perform "jobs that exist in significant numbers in the national economy" in light of the three positions identified by the VE, he did not specifically find that the number of jobs available in each position individually amounted to such significant numbers. (*See* AR at 25). In other words, the ALJ's "significant numbers" determination was premised on the *total* number of jobs available in the national economy for *all three positions*. (*See id.*). Because the ALJ's findings as to the Kitchen Helper position were not supported by substantial evidence, the ALJ's determination that these 279,000 total jobs are nationally available to Saiz is likewise lacking support. Instead, assuming without deciding that the ALJ's findings as to the Industrial Cleaner position were supported by substantial evidence, the record would only

support a determination that as many as 134,000 positions are available to Saiz in the national

economy—16,000 Industrial Cleaner jobs, and 118,000 Floor Waxer jobs. (*See id.*).

The critical question, then, is whether "the ALJ's error regarding the number of jobs that

[Saiz] can perform given the RFC limitations established by the ALJ constitutes harmless error."

*Sears v. Berryhill*, No. 17-cv-00391 JB/KBM, 2018 WL 1010553, at *11 (D.N.M. Feb. 21, 2018)

(quoting *Pemberton v. Berryhill*, No. 16-2501-SAC, 2017 WL 1492934, at *3 (D. Kan. Apr. 26,

2017)), *PFRD adopted in part and rejected in part*, 2018 WL 2002487 (D.N.M. Apr. 30, 2018).

This standard is "more rigorous . . . than the typical 'substantial evidence' standard" and

demands substantially more scrutiny from a reviewing court. *See Sears*, 2018 WL 2002487, at

*9. To illustrate this difference in relevant terms, if an ALJ finds that 134,000 jobs are nationally

available to a claimant and then explicitly determines that this is a "significant number" for step-

five purposes, a reviewing court applying the substantial-evidence standard only needs to find

that more than "a mere scintilla" of evidence supports the latter determination. *See Biestek v.

Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quotation omitted). But since the ALJ here did not find

that the 134,000 nationally available jobs amount to a "significant number," the Court must ask

whether it can "confidently say *no reasonable administrative factfinder*, following the correct

analysis, could have resolved the factual matter in any other way." *See Allen v. Barnhart*, 357

F.3d 1140, 1145 (10th Cir. 2004) (emphasis added). This is a tricky inquiry, since the Tenth

Circuit has cautioned that "the issue of numerical significance entails many fact-specific

considerations requiring individualized evaluation, and, most importantly, that the evaluation

'should ultimately be left to the ALJ's common sense in weighing the statutory language as

applied to a particular claimant's factual situation.'" *Id.* at 1144 (quotation omitted).

In a thorough opinion, United States District Judge James O. Browning considered a similar situation where the ALJ erred in adopting a VE's testimony that the claimant could perform one proposed position but did not err in finding that the claimant could perform another proposed position. *See Sears*, 2018 WL 1010553, at *8. Although the ALJ had found that the *total* number of nationally available jobs between the two positions was numerically significant, the elimination of the first position left only 50,000 available jobs. *See id.* Judge Browning acknowledged that "if [the ALJ] had made a determination that 50,000 was a significant number of jobs, the Court would be justified in affirming [her] decision." *Id.* at *10. But since the ALJ had made no such determination, the harmless-error standard had to be applied—and crucially, "[t]he Tenth Circuit has yet to establish the lower boundary of what counts as significant for harmless error purposes." *See id.* at *9 (citing (citing *Evans v. Colvin*, 640 F. App'x 731, 736 (10th Cir. 2016) (unpublished)). At most, Judge Browning observed, the Tenth Circuit has hinted that the number of available jobs that may be numerically significant as a matter of law falls somewhere between 100 jobs and 152,000 jobs. *See id.* (citing *Evans*, 640 F. App'x at 736).[11] Because this broad range did not amount to "clear guidance from the Tenth Circuit," Judge Browning declined as a matter of law to rule that no reasonable administrative factfinder could find that a total of 50,000 nationally available jobs was not numerically significant:

> The appropriate inquiry does not turn on whether "such work exists in the immediate area in which [a claimant] lives." Rather, the proper question focuses on whether such work "exists" in the "national economy." Whether "work . . . exists in the national economy" means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." Based on the statute's language, the Court foresees situations where a rational

---

[11] Since the Tenth Circuit's holding that 152,000 jobs amounted to numerical significance appears in an unpublished decision and was also informed by statistics on the number of jobs *regionally* available, *see Stokes v. Astrue*, 274 F. App'x 675, 684 (10th Cir. 2008), the actual lower boundary for nationally available jobs on harmless-error review could well be higher. It appears that the lowest number of nationally available jobs that the Tenth Circuit has found to be numerically significant on harmless-error review in a published decision is *1.34 million*. *See Raymond v. Astrue*, 621 F.3d 1269, 1274 (10th Cir. 2009).

> factfinder could conclude that 50,000 is not significant. For example, consider a claimant who lives in Biloxi, Mississippi, and qualifies for a job, but that job has a strong concentration in one region, perhaps Los Angeles, California, with 45,000 jobs there but only a smattering of jobs throughout the rest of the United States. If the ALJ determined that such a factual scenario demonstrated that the national jobs' numbers were insignificant, the Court would not be inclined to say that the ALJ was an irrational factfinder, or that he or she was wrong as a matter of law.

*See id.* at *10-11 (citations and footnote omitted).

Assuming that the ALJ in this case did not err in his evaluation of Saiz's ability to work as an Industrial Cleaner or as a Floor Waxer, the number of nationally available jobs at issue here—134,000—is much higher than the 50,000 jobs that Judge Browning considered in *Sears*, and it is much closer to the 152,000 jobs that the Tenth Circuit has suggested to be the lower boundary for numerical significance as a matter of law. *See Stokes v. Astrue*, 274 F. App'x 675, 684 (10th Cir. 2008) (unpublished). Nevertheless, the Court is mindful of the Tenth Circuit's admonition that "[h]armless error is seldom used to supply a missing dispositive finding in a situation such as this because [a] court must avoid 'usurping the administrative tribunal's responsibility to find the fact' and must not 'violate[] the general rule against post hoc justification of administrative action.'" *See id.* And the Court finds further guidance in the decisions of other jurists in this District who have also refused, on harmless-error review, to find that similarly high numbers of jobs were of numerical significance as a matter of law. *See, e.g.*, *Olguin v. Berrihill*, No. 18-cv-00482 SCY, 2019 WL 2232206, at *6-7 (D.N.M. May 23, 2019) (91,000 jobs); *Herrera v. Kijakazi*, No. 20-cv-00313 KG/JHR, 2021 WL 4653725, at *2-3 (D.N.M. Oct. 7, 2021) (122,000 jobs); *see also Halford v. Saul*, 19-cv-00413 JHR, 2020 WL 3832986, at *7 (D.N.M. July 7, 2020) (concluding that ALJ "*must* . . . make specific factual findings regarding the numerical significance requirement" where she "identifies fewer than

152,000 national jobs at Step Five").[12] Finally, the Court notes that neither party has briefed the issue of numerical significance, a fact that further counsels in favor of allowing the ALJ to weigh in on the matter in the first instance.

In summary, the ALJ erred by failing to resolve an apparent conflict between the DOT's requirements for the position of Kitchen Helper and the VE's testimony that Saiz could perform that job despite his RFC. *See, e.g.*, *Valdez*, 2022 WL 683024, at *3-4 (citing, *e.g.*, 196 F.3d at 1091; SSR 00-4p, 2000 WL 1898704, at *4). Consequently, the Court cannot say that the ALJ's determination that 145,000 Kitchen Helper jobs were available to Saiz in the national economy was supported by substantial evidence. *See id.* This, in turn, undermines the ALJ's finding that Saiz is not disabled at step five, since the ALJ only found that significant numbers of national jobs were available to Saiz when the Kitchen Helper jobs were included. (*See* AR at 25). Although a sizeable number of jobs are still nationally available to Saiz—as few as 118,000 jobs if limited to Floor Waxer positions, or as many as 134,000 jobs if Industrial Cleaner jobs are also included (*see id.*)—the ALJ did not find that *this* number was significant for step-five purposes, and the Court is constrained from reaching such a conclusion on harmless-error review "[g]iven the high bar the Tenth Circuit has set for a court to determine significance as a matter of law." *See, e.g.*, *Olguin*, 2019 WL 2232206, at *7. As such, the Court is precluded from finding that "no reasonable administrative factfinder, following the correct analysis," would have found Saiz to be disabled at step five. *See Allen*, 357 F.3d at 1144.

---

[12] Conversely, the Court acknowledges that other jurists in this District have found that much lower numbers of nationally available jobs amounted to numerical significance as a matter of law. *See, e.g.*, *Garcia v. Kijakazi*, No. 20-cv-00381 GJF, 2021 WL 3860352, at *6-7 & n.10 (D.N.M. Aug. 30, 2021) (finding 75,000 jobs to be "comfortably significant" on harmless-error review, and collecting cases where as few as 11,800 national jobs were deemed to be a significant number). In light of the Tenth Circuit's warnings in *Stokes, Allen*, and similar decisions, and given that the parties have not briefed this issue in this case, the Court respectfully declines to adopt the reasoning of those decisions in this case.

On remand, the ALJ need not reassess his determination that Saiz can perform work as a Floor Waxer, as no apparent conflict between the DOT listing for that position and the VE's testimony has been identified. However, the ALJ shall resolve any and all apparent conflicts between the VE's testimony and the DOT listings for the remaining identified positions. Under appropriate circumstances, the ALJ may also choose to clarify whether the number of nationally available Floor Waxer jobs—either alone or in combination with jobs available in other positions for which all conflicts have been resolved—amounts to a numerically significant number of jobs in the national economy.

## V. CONCLUSION

The ALJ erred in his review of Saiz's application for disability insurance benefits by failing to resolve an apparent conflict between information in the DOT and testimony from the VE. Accordingly, Plaintiff's Motion Reverse and Remand for a Rehearing (Doc. 20) is **GRANTED**, and the Court remands this case back to the SSA for proceedings consistent with this opinion.

_____
**KEVIN R. SWEAZEA**
**UNITED STATES MAGISTRATE JUDGE**